## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| INTELECT CORPORATION, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-0902 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 5, 11 |
| | : | | |
| CELLCO PARTNERSHIP GP, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANTS' MOTION TO TRANSFER VENUE AND
### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

In 2009, a consortium of four cellular telephone carriers (collectively "Defendants" or the "Carrier Consortium"),[1] entered into a Master License Agreement with the Washington Metropolitan Area Transit Authority ("WMATA") for the design and construction of a wireless communications infrastructure that would allow WMATA riders to use their cellular phones in Metrorail tunnels and stations. In this action, Plaintiff Intelect Corporation ("Intelect") claims that the Carrier Consortium failed to ensure that the general contractor they hired to undertake the WMATA project, Powerwave Technologies, Inc. ("Powerwave"), obtained the required surety payment bond covering the entire contract price—upwards of $65 million—in order to assure payment to all of Powerwave's subcontractors. Powerwave ultimately suffered financial difficulties and has since defaulted on its construction contract with the Carrier Consortium and

---

[1] Defendants claim that Intelect's complaint fails to name them properly. *See* Defs.' Mot. to Transfer Venue at 1 n.1, ECF No. 5. The parties agree, however, that the carriers do business under the following common names: Verizon Wireless, Sprint, AT&T, and T-Mobile. *See id.*; Am. Compl. ¶¶ 4–8.

filed for bankruptcy in the District of Delaware.  Because of Powerwave's default and bankruptcy, Intelect claims that Powerwave failed to make payments on several invoices, and that a total of $1,013,016.83 remains due to Intelect.  Intelect initiated this lawsuit not against Powerwave, but directly against the Carrier Consortium, contending that the Carrier Consortium knew that the project was not fully bonded, failed to inform Intelect and other subcontractors about that alleged problem, and, after Powerwave filed for bankruptcy, nevertheless induced Intelect to retain its employees by representing that the project would commence again in Spring 2013.

Now before the Court is Defendants' motion to transfer venue to the United States District Court for the District of Delaware (ECF No. 5) and Defendants' motion to dismiss this action for failure to state a claim (ECF No. 11).  For the foregoing reasons, the Court will deny Defendants' motion to transfer venue and will grant in part and deny in part Defendants' motion to dismiss.

## II.  FACTUAL BACKGROUND[2]

In 2008, as a condition of receiving $1.5 billion in federal funding, Congress required WMATA to ensure "that customers of [WMATA's] rail service . . . have access within the rail system to services provided by any licensed wireless provider . . . ."  Passenger Rail Investment and Improvement Act of 2008, Pub. L. No. 110-432, Div. B, § 601(e)(1), 122 Stat. 4907, 4969; *see also* Am. Compl. ¶ 10, ECF No. 8.  On February 26, 2009, WMATA's governing board granted approval for WMATA "to enter into a Master License Agreement with the Carrier Consortium to design, build, operate, and maintain seamless wireless communications coverage

---

[2] At the motion to dismiss stage, the Court accepts the plaintiff's factual allegations as true.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

for 47 underground stations and 50.5 miles of tunnels" for the Carrier Consortium's own use and for the use of WMATA and its customers.  Am. Compl. ¶ 11.  The contract required the Carrier Consortium to fund the Project at its own expense, and Intelect alleges that the Defendants essentially "assumed the role of Project Owner."  *Id.* ¶ 12.  On June 18, 2009, Defendants hired Powerwave as the project's general contractor.  *Id.* ¶ 14.  Powerwave, in turn, hired Intelect as a subcontractor on June 16, 2010, entering into a $5,629,122.26 subcontract under which Intelect was to complete a portion of the project.  *Id.* ¶ 17.  The specific contours of Intelect's portion of the project are not described in the complaint.

Intelect alleges that WMATA's "internal policies and standard contract forms" typically require its contractors to supply a payment bond "in the amount of . . . 100% of the contract" to ensure that all persons who supply labor and materials to the project are paid.  *Id.* ¶ 13.  Because the project was a "public-private partnership," however, WMATA only required the Carrier Consortium to obtain a nominal bond, in lieu of a surety payment bond for the full contract price.  *Id.*  Intelect alleges that WMATA "rel[ied] on the Carrier Consortium to require its contractor to bond the Project in the full amount of the contract."  *Id.*  The full amount of the project, according to the Carrier Consortium's contract with Powerwave, was $65,671,000.  *Id.* ¶ 14.  And Intelect claims that, although the contract between the Carrier Consortium and Powerwave divided the project into four milestones, or "phases," the Carrier Consortium's contract with Powerwave nevertheless "required Powerwave to provide for bonding in the amount of 100% of the full contract price."  *Id.* ¶¶ 15–16.

Intelect alleges that Powerwave did obtain a bond, naming Defendants as joint obligees, but that the bond was only valued at $5,000,000—a small fraction of the contract price.  *Id.* ¶¶ 18–20 & Ex. A (providing a copy of the payment bond documents).  Intelect thus contends that it

was apparent to Defendants on the face of the bond that Powerwave had failed to comply with the terms of the Powerwave-Carrier Consortium contract and had failed to secure the required bond. *Id.* ¶¶ 20–22.

Powerwave began to suffer financial difficulties in late 2012. As a consequence, Powerwave failed to make several payments to Intelect. In total, Intelect contends that invoices totaling $1,013,016.83 remain unpaid. *Id.* ¶¶ 23–24. Once Powerwave defaulted on its payment obligations, Intelect claims that one of its officers and its counsel both "requested a copy of the Powerwave Payment Bond" from the Carrier Consortium, which they "refused to provide." *Id.* ¶ 30. Intelect states that it was only after it "was able to obtain a copy of the bond, indirectly, through its insurance agent, that Intelect discovered, in January 2013, that the bond was limited in amount and restricted to Phase I, and that the monies then due from Powerwave to Intelect were primarily for work performed in Phases II and III." *Id.* ¶ 31.

Notwithstanding Powerwave's failure to pay Intelect, Intelect "continued to supply labor and materials to the Project for the benefit [of] and use by the Carrier Consortium." *Id.* ¶ 26. Intelect further claims that although Defendants "had actual knowledge that Powerwave was financially unstable" as of the fall of 2012, "and that the work being performed by Powerwave's subcontractors and suppliers were not covered by the Payment Bond . . . the Carrier Consortium continued to accept the benefits of Intelect's performance." *Id.* ¶ 28. Moreover, as relevant to its promissory estoppel claim, Intelect alleges that "the Carrier Consortium represented to Intelect that work on the Project would resume in early Spring 2013, and requested that Intelect leave its equipment and materials on site, and to continue to maintain its labor force in place." *Id.* ¶ 80.

On January 28, 2013, Powerwave filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. *See* Chapter 11 Voluntary Petition, *In re Powerwave Techs.,*

*Inc.*, No. 13-10134 (Bankr. D. Del. Jan. 28, 2013), ECF No. 1.  Intelect filed a proof of claim in those bankruptcy proceedings seeking $1,013,017.00.  *See* Defs.' Mot. to Dismiss Ex. A, ECF No. 11 (attaching proof of claim).  Separately, Intelect commenced this action in District of Columbia Superior Court against the Carrier Consortium.  Intelect's complaint seeks judgment in the amount of $1,013,016.83 on alternative theories of negligence, negligent misrepresentation, implied contract, unjust enrichment, constructive fraud, and as a third-party beneficiary to the various agreements between WMATA, Defendants, and Powerwave.  *See* Am. Compl. at 15. Each of these counts are based on the Carrier Consortium's alleged failure to ensure that the project was fully bonded or to advise Powerwave's subcontractors that they might not be paid by the payment bond should Powerwave default on its obligations.[3]  *See id.* ¶¶ 29–77.  Intelect also brings a separate claim of promissory estoppel seeking $400,000 it allegedly incurred in continuing to employ its employees when the Carrier Consortium represented that the project would resume in spring 2013 and asked that Intelect maintain its labor force in place.  *Id.* ¶¶ 80– 81.

Defendants removed the action to this Court on June 11, 2015, invoking diversity jurisdiction under 28 U.S.C. § 1332, and bankruptcy jurisdiction under 28 U.S.C. § 1334.  *See* Notice of Removal at 6, ECF No. 1.  Defendants have since filed a motion to transfer venue to the United States District Court for the District of Delaware, where Powerwave's bankruptcy proceedings are ongoing, *see* Defs.' Mot. to Transfer Venue, ECF No. 5, and a motion to dismiss Intelect's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, *see* Defs.' Mot. to Dismiss, ECF No. 11.

---

[3] As discussed below, Intelect initially brought a claim of conversion against Defendants but has since amended its complaint to withdraw that count.

## III.  ANALYSIS

The Court will first consider Defendants' motion to transfer venue.  Finding that the convenience of the parties and witnesses and the interest of justice weigh against transferring this case, the Court will deny that motion.  As a result, the Court proceeds to consider Defendants' motion to dismiss and, as explained below, will grant the motion in part and dismiss Counts II and V of the Amended Complaint, but will otherwise deny the motion.

### A.  Motion to Transfer Venue

Defendants seek to transfer this case to the United States District Court for the District of Delaware.  Changes of venue in civil actions are generally governed by 28 U.S.C. § 1404(a), which states that: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  A separate change of venue provision, 28 U.S.C. § 1412, applies when a party seeks to transfer a bankruptcy case or proceeding.[4]  Section 1412 provides that: "A district court may

---

[4] In fact, the law is potentially more nuanced.  In addition to granting federal courts exclusive jurisdiction over title 11 cases, *see* 28 U.S.C. § 1334(a), Congress has granted original, but not exclusive, bankruptcy jurisdiction to federal district courts over "all civil proceedings arising under title 11, or arising in or related to cases under title 11," *id.* § 1334(b).  There is a spilt of authority among federal courts regarding whether § 1412 governs the transfer of proceedings under all three grants of jurisdiction listed in § 1334(b).  *See, e.g., City of Liberal, Kan. v. Trailmobile Corp.*, 316 B.R. 358, 361–62 (D. Kan. 2004) (explaining split of authority and citing cases).  Because § 1412 uses the phrase "under title 11," which fails to track the predecessor statute in explicitly referencing "related-to" proceedings, some courts have held that § 1404(a) governs the transfer of cases that only "relate to cases under title 11."  *See Ries v. Ardinger (In re Adkins Supply, Inc.)*, No. 11-10353, Adv. Case No. 14-01000, 2015 WL 1498856, at *2 (Bankr. N.D. Tex. Mar. 27, 2015) (noting the argument and citing cases).  Others, emphasizing legislative history and the use of the word "proceeding" in other parts of the bankruptcy code to modify the entirety of the phrase "arising under title 11, or arising in or related to cases under title 11," have concluded that § 1412 governs the transfer of any proceeding mentioned in 28 U.S.C. § 1334(b)—including those "related to cases under title 11."  *Id.* at *3 (discussing alternative argument).  Because the Court would decline to transfer this case

transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.

Defendants' motion to transfer venue hollowly invokes 28 U.S.C. § 1412, and does little to justify the existence of bankruptcy jurisdiction.  In their opening motion, Defendants argue in a footnote that this action "involves matters that are both 'core' and that 'arise under' title 11," specifically referencing Count VII of Intelect's original complaint.  *See* Defs.' Mot. to Transfer Venue at 2 n.3; Notice of Removal Ex. A, ¶¶ 78–84 (reproducing initial complaint, including Count VII).  That Count alleged that Defendants had converted certain Intelect property Defendants "purported to purchase . . . in a bankruptcy-court approved transaction, notwithstanding actual knowledge that such property was owned by Intelect."  Notice of Removal Ex. A, ¶ 81.  Defendants contend that title to this property was transferred to them pursuant to an order of the Bankruptcy Court approving a settlement agreement between Powerwave and Defendants, and therefore argue that Count VII represents a direct challenge to the Settlement Approval Order.  *See* Defs.' Mot. to Transfer Venue at 2 n.2, 4; Notice of Removal at 8 (arguing that Count VII "'arises under' and 'arises in' Powerwave's Bankruptcy Case" because that count "directly implicates—on the face of the Complaint—the Delaware Bankruptcy Court's Settlement Approval Order").

Perhaps in an effort to counter that argument, Intelect amended its complaint to omit Count VII after Defendants filed their motion to transfer venue, *see generally* Am. Compl., and now argues in a single, four-sentence paragraph in opposition to Defendants' motion to transfer that the absence of Count VII from this case "moots the Motion to Transfer."  Pl.'s Opp'n to

---

under either § 1412 or § 1404(a), the Court need not resolve the question here.  *Cf. City of Liberal*, 316 B.R. at 362.  For ease of reference, the Court will refer to section § 1412 as governing the transfer of any case in which there exists bankruptcy jurisdiction.

Defs.' Mot. to Transfer Venue at 1, ECF No. 12.  Intelect is plainly incorrect.  It ignores the bulk

of Defendants' motion, which specifically discusses the remaining counts of the complaint and

raises arguments for transferring this case on the basis of those other counts.  *See* Defs.' Mot. to

Transfer Venue at 3–4; Defs.' Reply Supp. Mot. to Transfer Venue at 1, ECF No. 16 (reiterating

these points).  Thus, to the extent that Intelect's unsupported statement is intended to imply that

the sole ground for invoking § 1412 in support of transferring this case was Count VII, the Court

does not share that understanding.  On the contrary, Defendants' Notice of Removal explicitly

contends that "Counts 1 through 6 'relate to' the Powerwave Bankruptcy Case" because "[t]hose

counts seek to hold Defendants liable for Powerwave's debts" and seek to recover the same

amount that Intelect seeks on its proof of claim in the bankruptcy proceeding.  Notice of

Removal at 7–8.

Nevertheless, with Count VII of the original complaint no longer a part of this case, the

application of § 1412 depends upon a finding that Counts I through VI of the Amended

Complaint "relate to" the Powerwave bankruptcy proceedings.  Briefly stated, the Court has

considerable doubt that they are.  While the D.C. Circuit has not yet discussed the contours of

"related to" bankruptcy jurisdiction, the Supreme Court has generally agreed with the test

expressed by the Third Circuit in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (1984), despite noting

some minor differences among circuits.  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 308 & n.6

(1995); *see also* 1 Collier on Bankruptcy ¶ 3.01[3][e][ii], at 3-16 (16th ed. 2015) ("Almost every

other court considering the issue, including the United States Supreme Court, has agreed in

principle with *Pacor*'s statement of the law" (footnotes omitted)).  As described in *Pacor*, "[t]he

usual articulation of the test for determining whether a civil proceeding is related to bankruptcy

is whether *the outcome of that proceeding could conceivably have any effect on the estate being*

*administered in bankruptcy . . . ."  Celotex Corp.*, 514 U.S. at 308 n.6 (quoting *Pacor*, 743 F.2d at 994); *see Abbey v. Modern Africa One, LLC*, 305 B.R. 594, 601 (D.D.C. 2004) (applying the *Pacor* test).  This includes proceedings among third parties—and not including the debtor—so long as the "outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively)."  *Celotex Corp.*, 514 U.S. at 308 n.6 (quoting *Pacor*, 743 F.2d at 994); *see also* 1 Collier on Bankruptcy ¶ 3.01[3][e][ii][B] (providing examples of cases between third parties that are "related to" bankruptcy proceedings).

In the circumstances of this case, the question is a close one.  On the one hand, it is somewhat difficult to conclude that this action is "related to" the Powerwave bankruptcy action.  Powerwave is not a party to this action, and no monetary recovery is being sought from directly from Powerwave.  *See Abbey*, 305 B.R. at 602–03 (declining to transfer case, and concluding that the bankruptcy court would lack jurisdiction, in part because no monetary award was being sought from the debtor).  Although Intelect seeks to recover a sum identical to the amount it seeks through its proof of claim in the bankruptcy proceeding, it has brought separate claims based on Defendants' own actions and liability, which are independent from the breach of contract claims it asserts against Powerwave.  *Cf. DeLuca v. McKenna (In re Remington Dev. Grp., Inc.)*, 180 B.R. 365, 370 (Bankr. D.R.I. 1995) (finding that the bankruptcy court lacked jurisdiction over a claim that the creditor had initiated against a third-party because the "successful third-party claim would only establish [the third party]'s liability to [the creditor]" and "would create no rights or liabilities on the debtor's account).  Even if Defendants might seek to offset any recovery Intelect obtains in this case with recovery obtained upon Intelect's proof of claim in the bankruptcy proceeding, it is not clear that any recovery here will *directly* affect that proceeding or the bankruptcy court's consideration of Intelect's proof of claim or

9

Powerwave's own liability. *Cf. Cenith Partners, LP v. Hambrecht & Quist, Inc. (In re VideOcart, Inc.)*, 165 B.R. 740, 744 (Bankr. D. Mass. 1994) (remanding case between third-parties removed on the basis of bankruptcy jurisdiction because, despite the "appearance of the plaintiff as a creditor in the Debtor's schedules," recovery by the plaintiff "will not directly affect the Debtor's bankruptcy estate" and the fact that defendants "might have contribution claims against the Debtor in the future if the plaintiff is successful" was "too tenuous and speculative an event . . . to confer 'related to' jurisdiction"). *But see Bankest v. United Beverage Fla., Inc. (In re United Container LLC)*, 284 B.R. 162, 169–71 (Bankr. S.D. Fla. 2002) (disagreeing with *In re VideOcart* and other cases, and finding that related to jurisdiction existed "albeit barely" where defendants claimed they had both contractual and state and federal legal bases for indemnity by the Debtor and where both parties had filed proofs of claim in the Debtor's bankruptcy case).

On the other hand, Defendants' Notice of Removal posits that resolution of Counts I through VI will have a "conceivable effect" on the Powerwave bankruptcy case because "any award of damages would relieve Powerwave of its obligation to satisfy these amounts" and therefore "impact Powerwave's liability to Intelect." Notice of Removal at 8; *cf. HH1, LLC v. Lo'r Decks at Calico Jacks, LLC*, Adv. Case No. 10-02004, 2010 WL 1009235, at *2 (Bankr. M.D.N.C. Mar. 18, 2010) (concluding that "related to" jurisdiction existed where a plaintiff might recover from a guarantor of the debtor's debt which "would reduce or eliminate the plaintiff's claim in the bankruptcy case and result in a substitution of the guarantors as the claimants against the Debtor" despite the existence of "additional issues related to whether the guarantors are liable even if there is a showing of liability on the part of the Debtor"). And *Pacor* itself stands for the proposition that "[a]n action is related to bankruptcy if the outcome could alter the debtor's rights, [or] liabilities, . . . (*either positively or negatively*)" even if the

claims are not brought against the debtor or the debtor's property.  743 F.3d at 994 (emphasis

added); *accord Celotex Corp.*, 514 U.S. at 308 n.6 (quoting same).

      The Court is inclined to think that Intelect's claims in this case do not "relate to" the

Powerwave bankruptcy proceeding in the legal sense.  Intelect does not claim that Defendants

are guarantors of Powerwave's obligations to Intelect.  And Intelect's claims here arise out of

Defendants' own actions, so it is therefore unlikely that the Court will have to meaningfully

consider Powerwave's liability to resolve Intelect's claims against the Carrier Consortium.  If the

Court is not being asked to determine Powerwave's liability, then it is not immediately clear that

a successful recovery against the Defendants here would lessen or eliminate Powerwave's

liability under the proof of claim.  If anything, Defendants' factual proposition may only follow

in the opposite direction: because Intelect is seeking recovery on Counts I through VI of a sum

identical to the amount it alleges remain due from Powerwave, if Intelect were to recover from

Powerwave to some degree on its proof of claim, that might eliminate some or all of the recovery

Intelect seeks from Defendants in this action.

      In any event, the Court declines to definitively resolve the question.[5]  As several courts

have noted, § 1412 and § 1404(a) demand essentially the same inquiry.  *See* 15 Charles Alan

Wright, Arthur R. Miller & Edward D. Cooper, *Federal Practice & Procedure* § 3843, at 45–46

(4th ed. 2013) (explaining that "although bankruptcy matters are governed by their own transfer

statute, 28 U.S.C.A. § 1412, courts have held that this provision requires essentially the same

analysis and turns on the same issues as the transfer of civil actions under Section 1404(a)");

---

[5] Declining to decide this issue does not undermine Defendants' grounds for removing
this action.  Defendants alternatively asserted federal diversity jurisdiction which does apply.
Intelect is a citizen of Maryland, where it is incorporated, Defendants are all citizens of
Delaware, where they are each incorporated, and more than $75,000 is in controversy.  *See* Am.
Compl. ¶¶ 3–8; Notice of Removal at 6; 28 U.S.C. § 1332(c)(1).

accord, e.g., *New Eng. Wood Pellet, LLC v. New Eng. Pellet, LLC*, 419 B.R. 133, 148 (D.N.H. 2009); *City of Liberal, Kan. v. Trailmobile Corp.*, 316 B.R. 358, 362 (D. Kan. 2004). "The only substantial difference between the statutes is the additional requirement under § 1404(a) that an action may be transferred to any place where venue could have been valid originally." *City of Liberal*, 316 B.R. at 362.

Consequently, the Court will consider Defendants' motion to transfer venue under § 1404(a) but notes that its conclusion would remain the same if § 1412 applies.

### 1. Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). Section 1404(a) vests "discretion in the district court to adjudicate motions to transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The moving party bears the burden of establishing that transfer under § 1404(a) is proper. *Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 32 (D.D.C. 2008).

Accordingly, the defendant must make two showings to justify transfer. First, the defendant must establish that the plaintiff originally could have brought the action in the proposed transferee district. *Van Dusen*, 376 U.S. at 616. Second, the defendant must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to that district. *Trout Unlimited v. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996). In evaluating a motion to transfer, a court may weigh several private- and public-interest factors. *Sheffer v. Novartis Pharm. Corp.*, 873 F. Supp. 2d 371, 375 (D.D.C. 2012) (citing *Trout*

*Unlimited*, 944 F. Supp. at 16).   The private-interest considerations include: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) the location where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) ease of access to sources of proof.  *Id.*; *Montgomery*, 532 F. Supp. 2d at 32.   "Public interest considerations include: (1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home."  *Onyeneho v. Allstate Ins. Co.*, 466 F. Supp. 2d 1, 3 (D.D.C. 2006); *see also Airport Working Grp. of Orange Cnty., Inc. v. U.S. Dep't of Def.*, 226 F. Supp. 2d 227, 229 (D.D.C. 2002).   "If the balance of private and public interests favor a transfer of venue, then a court may order a transfer."  *Sheffer*, 873 F. Supp. 2d at 375 (citing *Montgomery*, 532 F. Supp. 2d at 32).

## 2. Application

Because Defendants focus on § 1412 and assume the existence of bankruptcy jurisdiction, they do not directly address the first showing under § 1404(a): whether the plaintiff originally could have brought the action in the proposed transferee district.  *Van Dusen*, 376 U.S. at 616.   That showing appears to be satisfied here, even if there is no "related to" bankruptcy jurisdiction over this action under 28 U.S.C. § 1334(b).[6]   "To transfer a case, the transferor court must find that the intended transferee court has personal jurisdiction and is an appropriate venue."  *Virts v. Prudential Life Ins. Co.*, 950 F. Supp. 2d 101, 104 (D.D.C. 2013) (citing *Relf v. Gasch*, 511 F.2d 804, 807 (D.C. Cir. 1975)).   As alleged in Intelect's complaint, each of the

---

[6] If there is "related to" jurisdiction, venue would also be proper in the District of Delaware, where the Powerwave bankruptcy is pending.  *See* 28 U.S.C. § 1409 (noting that, barring certain exceptions not relevant here, "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending").

Defendants are incorporated in Delaware, which would establish personal jurisdiction over the Defendants there.  *See* Am. Compl. ¶¶ 4–8; Notice of Removal at 6 (citing the complaint); *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014).  Because all of the defendants are citizens of Delaware, venue would also be proper there.  A civil action may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).  Accordingly, Intelect could have originally brought this action in the District of Delaware.

Despite clearing this first hurdle, the Court nevertheless concludes that neither the public nor the private considerations indicate that transferring this case would further the convenience of the parties and the witnesses or the interest of justice.

Considering the private interests, Defendants posit that because the parties have all "actively participated in the Powerwave Bankruptcy case," and because Intelect "is headquartered in Baltimore," Delaware would be "nearly equally convenient for Plaintiff as is Washington, D.C."  Defs.' Mot. to Transfer Venue at 5.  Even if Delaware would be equally convenient, however, "a plaintiff's choice of forum is ordinarily 'a paramount consideration' that is entitled to 'great deference' in the transfer inquiry."  *F.T.C. v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 26 (D.D.C. 2008) (quoting *Thayer/Patricof Educ. Funding LLC v. Pryor Res.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002)).  While "[d]eference to the plaintiff's chosen forum is minimized . . . where that forum has no meaningful connection to the controversy," *United States v. H&R Block, Inc.*, 789 F. Supp. 2d 74, 79 (D.D.C. 2011), Intelect's claims are related to the Defendants' contract with WMATA, which is headquartered in D.C., providing the District of Columbia with a strong connection to this controversy.  In addition, while Defendants' transfer

motion does not address the location where Intelect's claims against the Carrier Consortium arose, they do not contend that those claims arose in Delaware.

Defendants counter that this lawsuit presents "precisely the situation where Plaintiff's original choice of venue *should* be disturbed" because it "assert[s] claims that duplicate [the Plaintiff's] Proof of Claim." Defs.' Mot. to Transfer Venue at 4. But, as already explained, even though Intelect seeks to recover a value identical to the amount Powerwave owes to it, its *claims* are distinct and raise separate grounds for imposing liability on Defendants, not Powerwave. And if Defendants' argument intends to invoke the "home court" presumption that many courts have applied when considering whether to transfer bankruptcy proceedings, the Court's doubts that "related to" jurisdiction exists render that presumption largely inoperative here. *See, e.g.*, *Irwin v. Beloit Corp. (In re Harnischfeger Indus., Inc.)*, 246 B.R. 421, 439 (Bankr. N.D. Ala. 2000) (explaining that "[a] majority of the courts that have considered whether change of venue is appropriate have created a presumption that the bankruptcy court in which the debtor's case is pending, the home court, is the proper venue for adjudicating all proceedings in the case").

For similar reasons, the Court finds Defendants' arguments that Powerwave "will be a central party in this action," that it will be "most convenient for potential witnesses and the parties to adjudicate Plaintiff's disputes with both Powerwave and Defendants only once," and that Powerwave "will be subject to third party discovery" all fail to weigh in favor of transfer. Defs.' Mot. to Transfer Venue at 5. Powerwave is not a party to this dispute, nor does Intelect assert any claim against Powerwave. Although the Court cannot foreclose the possibility of third party discovery, presumably many of the contractual documents relevant to Intelect's claims against Defendants, specifically the Carrier Consortium-WMATA contract documents and the Carrier Consortium-Powerwave contract, are likely already in Defendants' possession. And the

Defendants do not explain exactly what witnesses or documents they will be unable to obtain if this case is not tried in Delaware, or where those witnesses or documents are actually located. Having failed to address these points, Defendants have likewise failed to carry their burden to show that either the convenience of the witnesses or the ease of access to sources of proof weigh in favor of transfer.  Thus, the Court concludes that the private factors weigh against transfer.

The public interests also do not weigh in favor of transfer.[7]  Defendants assert that they will "seek to have this matter referred to the Delaware Bankruptcy Court," and that the "Delaware Bankruptcy Court has an interest in adjudicating" Counts I through VI.  *Id.* at 1, 4. Yet, again, the Court emphasizes that Intelect's claims cover distinct theories of liability against Defendants, not Powerwave.  Given the Court's skepticism that the remaining counts even "relate to" the Powerwave bankruptcy proceedings in the legal sense, it is doubtful that judicial economy will be served through a transfer or that transferring this case will "reduce duplicative discovery and avoid the risk of inconsistent judgments."  *Id.* at 3.  "Related to" cases are non-core proceedings under 28 U.S.C. § 157(c), which means that, absent the consent of the parties, the bankruptcy court may only submit proposed findings of fact and conclusions of law.  *See* 28 U.S.C. § 157(c); *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1473 (D.C. Cir. 1991); *Abbey*, 305 B.R. at 601; *Premium of Am., LLC v. Sanchez (In re Premium Escrow Servs., Inc.)*, 342 B.R. 390, 407 n.20 (Bankr. D.D.C. 2006).  Moreover, Defendants do not claim that Count VII of the Amended Complaint, Intelect's promissory estoppel claim—which does not involve Powerwave and is based on circumstances that arose only *after* Powerwave filed for bankruptcy—even

---

[7] Intelect omitted its conversion claim from the Amended Complaint.  As a result, the Court need not address whether resolving that claim, which may have required this Court to interpret and enforce the Delaware bankruptcy court's Settlement Approval Order, would weigh in favor of transfer.  *See* Defs.' Mot. to Transfer Venue at 4.

"relates to" the Powerwave bankruptcy proceeding.  It is likely that the Delaware bankruptcy court lacks jurisdiction to even consider that claim.[8]  At least portions of this case therefore will inevitably be adjudicated by a district court.  Judicial economy would not be served by substituting the District of Delaware for this Court.  *See Abbey*, 305 B.R. at 604 (declining to transfer in similar circumstances where several of plaintiffs' claims "could well be viewed as non-core, and thus, even though the Bankruptcy Court in Virginia is familiar with this matter, a district court judge in the Eastern District would [end] up having to adjudicate this matter").

Of course, it is possible that any favorable recovery Intelect obtains from Defendants on Counts I through VI will be offset by Intelect's recovery, if any, on the proof of claim it has submitted in the Powerwave bankruptcy proceedings.  The damages issues in this case may overlap in that respect.  But the Court does not believe that the factual and legal questions pertinent to the *liability* issues concerning Intelect's distinct claims against the Carrier Consortium are likely to overlap considerably with the Powerwave bankruptcy proceedings.  And Intelect's promissory estoppel claim based on representations Defendants allegedly made

---

[8] In their motion to transfer Defendants argue only that this count (previously numbered as Count VIII) "concerns ancillary matters with which the Delaware Bankruptcy Court is most familiar, as it has presided over that bankruptcy case for more than two years," *see* Defs.' Mot. to Transfer Venue at 4, and their notice of removal cites supplemental jurisdiction under 28 U.S.C. § 1367 as a basis for federal jurisdiction over this count, *see* Notice of Removal at 6, 8.  Despite Defendants' assertion that they plan to request this case be referred to the Bankruptcy Court for the District of Delaware, whether a *bankruptcy court* (as distinguished from the district court) is permitted to invoke supplemental jurisdiction to consider the promissory estoppel claim notwithstanding the strictures of 28 U.S.C. § 157 is a question on which the circuits are divided. *See, e.g.*, *Cavalry Const., Inc. v. WDF, Inc. (In re Cavalry Const., Inc.)*, 496 B.R. 106, 112–116 (S.D.N.Y. 2013) (noting circuit split and citing cases); *In re Semcrude, L.P.*, No. 08-11515, 2010 WL 5140487, at *18 (Bankr. D. Del. Dec. 13, 2010) (noting circuit split, citing cases, and "declin[ing] to assert supplemental jurisdiction as an independent ground for finding subject matter jurisdiction over" the claims at issue).

directly to Intelect after Powerwave defaulted on its contract obligations to Intelect bears no relation to the bankruptcy proceedings.

Finally, Defendants have not addressed the remaining two public interest considerations: the "transferee's familiarity with the governing law" and "the relative congestion of the courts of the transferor and potential transferee." *Onyeneho*, 466 F. Supp. 2d at 3. In any event, the Court believes that both of these factors weigh against transfer here. As explained below, the parties argue that either Maryland or District of Columbia law applies to Intelect's claims. In either event, the federal courts in Delaware will not be particularly familiar with the governing law. In addition, the federal courts in the District of Delaware are considerably more congested than those in this district. As of June 30, 2015, the District of Delaware faced more than *double* the number of pending cases per judge than the judges in this district face. *See* Administrative Office of the U.S. Courts, *U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics* 2, 14 (June 30, 2015), *available at:* http://www.uscourts.gov/statistics/ table/na/federal-court-management-statistics/2015/06/30-3 (noting that the District for the District of Columbia faced 218 pending cases per judgeship, while the District of Delaware faced 523). Thus, the relative congestion of the courts weighs strongly in favor of retaining this case in the District of Columbia.

Absent a showing that the District of Delaware would prove more convenient to the parties or judicial economy would be substantially served by considering this case in tandem with the Powerwave bankruptcy proceedings, the Court believes that "[t]he deference owed to the plaintiffs' choice of forum tips the scale against the transfer motion." *Sparshott v. Feld Entm't, Inc.*, 89 F. Supp. 2d 1, 4 (D.D.C. 2000) (declining to transfer a case to the "Eastern

District of Virginia, where a pending bankruptcy proceeding involves many of the same issues and parties"). Defendants' motion to transfer will be denied.

### B. Motion to Dismiss

Defendants have also moved to dismiss all seven counts of Intelect's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. As explained below, the Court agrees that Intelect has failed to state a claim for negligent misrepresentation (Count II), constructive fraud (Count VI), and—at least considering complaint's current factual allegations—promissory estoppel (Count VII). On the remaining counts, however, the Court concludes that Intelect has plausibly stated a claim and therefore will deny Defendants' motion to dismiss as to Counts I, III, IV, and V.

### 1. Legal Standard

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a

plaintiff's factual allegations "must be enough to raise a right to relief above the speculative

level, on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements," are therefore insufficient to

withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal

conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that

are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.

### 2.  Choice of Law Analysis

The Court must first identify the law that governs Intelect's claims.  The parties dispute

what law applies to this action.  Defendants urge that Maryland law should apply because

Intelect is a corporate citizen of Maryland, because a portion of the project was performed in

Maryland, and because, they claim, any injury Intelect suffered occurred in Maryland.  *See*

Defs.' Mem. Supp. Mot. to Dismiss at 7 ("Defs.' Mem. Supp."), ECF No. 11; Defs.' Reply Supp.

Mot. to Dismiss at 3 ("Defs.' Reply"), ECF No. 15.  Intelect, by contrast, contends that District

of Columbia law should apply because the location of the project at issue here—the Metrorail

stations and tunnels—is primarily in the District and the parties' relationship is therefore

centered in the District of Columbia.  *See* Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 3–5

("Pl.'s Mem. Opp'n"), ECF No. 13.

"A federal court sitting in diversity must apply the choice-of-law rules of the forum

state—here, the District of Columbia."  *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C.

Cir. 2014).[9]  The District of Columbia "employ[s] 'a modified governmental interests analysis

---

[9] Although the Court has already expressed doubt that bankruptcy jurisdiction exists in this case, to the extent 28 U.S.C. § 1334 is the proper jurisdictional hook, the choice-of-law rule that applies is murkier.  Some circuits apply the choice of law rules of the jurisdiction in which

which seeks to identify the jurisdiction with the most significant relationship to the dispute."

*Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006).  Under this approach,

a court must first "determine whether a 'true conflict' exists—that is, whether more than one

jurisdiction has a potential interest in having its law applied and, if so, whether the law of the

competing jurisdictions is different."  *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992)

(citing *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985); *Fowler v. A & A

Co.*, 262 A.2d 344, 348 (D.C. 1970)).  If "there is no 'true conflict'" among the purportedly

interested jurisdictions, and where one of those jurisdictions is the District of Columbia, a court

will "apply the law of the District of Columbia by default."  *Id.* (citing *Fowler*, 262 A.2d at 348;

Restatement (Second) of Conflict of Laws § 186 cmt. c (Am. Law Inst. 1971)).  But if a "true

---

the bankruptcy court sits, while others apply federal choice-of-law principles. *Compare, e.g.*, *Amtech Lighting Servs. Co. v. Payless Cashways, Inc. (In re Payless Cashways)*, 203 F.3d 1081, 1084 (8th Cir. 2000) ("The bankruptcy court applies the choice of law rules of the state in which it sits."), *with Lindsay v. Beneficial Reins. Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir. 1995) (holding that "[t]he rule in diversity cases, that federal courts must apply the conflict of laws principles of the forum state, does not apply to federal question cases such as bankruptcy" because "[i]n federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules").  The extent to which the Ninth Circuit's rationale in applying federal choice-of-law principles extends to "related to" cases, over which state and federal courts share concurrent jurisdiction, is even less clear.  *See Lindsay*, 59 F.3d at 948 (emphasizing "exclusive jurisdiction in federal court"); *Campbell v. Fawber*, 975 F. Supp. 2d 485, 506 (M.D. Pa. 2013) (distinguishing *Lindsay* on the ground that "[d]istrict courts have concurrent jurisdiction over matters 'related to' bankruptcy" and, therefore, "concerns arising from possible forum shopping are not ameliorated in the instant matter by exclusive federal jurisdiction").

While the D.C. Circuit has not yet addressed the issue, no party disputes that state law, and not federal law, governs Intelect's claims against Defendants.  In similar circumstances, the D.C. Circuit has held that if "a federal court applies state law when it decides an issue not addressed by federal law, regardless of the source from which the cause of action is deemed to have arisen for the purpose of establishing federal jurisdiction," a federal court should adopt the choice of law rules of the state in which the court sits because "[a] choice-of-law rule is no less a rule of state law than any other."  *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995).  As a result, the Court's choice of law analysis would be identical even if federal jurisdiction in this case is grounded on 28 U.S.C. § 1334.

conflict" does exist, "the court must go on to determine which of the relevant jurisdictions has

the 'more substantial interest' in having its law applied to the case under review." *Id.* To make

that determination, a court must consider the four significant relationship factors "enumerated in

the Restatement (Second) of Conflict of Laws § 145" which include: (1) "the place where the

injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the

domicile, residence, nationality, place of incorporation and place of business of the parties," and

(4) "the place where the relationship is centered." *District of Columbia v. Coleman*, 667 A.2d

811, 816 (D.C. 1995) (quoting Restatement (Second) of Conflict of Laws § 145).

   Here, the parties do not meaningfully engage with the first step of the analysis. By

proceeding directly to analyzing which jurisdiction has the most significant relationship over this

dispute, the parties seem to assume that there is a true conflict among Maryland and District of

Columbia law. That implicit assumption makes some sense, as Maryland would appear to have

an interest in protecting its corporate citizen, Intelect, while the District of Columbia presumably

has an interest in regulating the course of business transactions engaged in the forum and the

agreements governing the projects taking place there. *Cf. Washkoviak*, 900 A.2d at 181 (finding

that a conflict existed where "Wisconsin has a powerful interest in protecting its residents from

fraud and misrepresentation, while the District of Columbia has an equally strong interest in

ensuring that its corporate citizens refrain from fraudulent activities"); *Hercules & Co. v. Shama

Rest. Corp.*, 566 A.2d 31, 42 (D.C. 1989) (concluding that "Virginia has a stronger interest than

does the District in setting standards and expectations for architects in connection with a

renovation project in Virginia").

   But even if Maryland and the District of Columbia both have an interest in having their

law applied to a case like this one, the parties do not discuss whether "the law of the competing

jurisdictions is different." *GEICO*, 958 F.2d at 1141.  In fact, with one exception, the parties

have not identified any substantive differences among Maryland and District of Columbia law

with respect to the claims Intelect asserts.[10]  Moreover, because "[t]he common law of Maryland

is 'the source of the District's common law'" and is "'an especially persuasive authority when

the District's common law is silent,'" there is additional reason to think that the relevant law

might not be all that different with respect to at least some of Intelect's claims.  *Saylab v. Don*

*Juan Rest., Inc.*, 332 F. Supp. 2d 134, 142–43 (D.D.C. 2004) (quoting *Napoleon v. Heard*, 455

A.2d 901, 903 (D.C. 1983); *see also* D.C. Code § 45-401.  If the law in each jurisdiction is the

same, District of Columbia law would apply by default.  *GEICO*, 958 F.2d at 1141 (finding no

conflict where the law in Maryland, Virginia, and the District of Columbia "is the same with

respect to the interpretation of insurance contracts—in all three, the plain meaning of the policy

language controls, and any ambiguities are resolved in favor of the insured").

Regardless, upon consideration of the substantial relationship factors and the present

record, the Court concludes that District of Columbia law applies.  In their opening

memorandum, Defendants only reference the first factor, the place of the injury, and generally

assert that any injury Intelect suffered "would have occurred in Maryland, the state under which

it is organized and authorized to conduct business."  Defs.' Mem. Supp. at 7.  In reply,

Defendants go a bit further to argue that the injury underlying Intelect's negligent

misrepresentation claim occurred in Maryland, where Intelect "received the alleged

---

[10] The one exception is a purported difference Intelect has identified between Maryland law and "that of other states" with respect to Intelect's unjust enrichment and quantum meruit claims. Maryland law apparently will not permit a downstream subcontractor to recover from an owner in quantum meruit even where an owner fails to pay a general contractor (who, in turn, fails to pay a subcontractor).  *See* Pl.'s Mem. Opp'n at 15 n.7 (citing *Truland Serv. Co. v. McBride Elec., Inc.*, No. ELH-10-03445, 2011 WL 1599543 (D. Md. Apr. 27, 2011)).

misrepresentations." Defs.' Reply at 3.  Plaintiff counters that its location "is sheer

happenstance."  Pl.'s Mem. Opp'n at 3.  District of Columbia courts agree that the place of injury

in these types of cases is not particularly significant when weighing the jurisdictions' relative

connections to the case.  *See, e.g.*, *Washkoviak*, 900 A.2d at 181 (citing the Restatement (Second)

of Conflict of Laws for the proposition that "the place of injury is less significant in the case of

fraudulent misrepresentations"); *Hercules & Co.*, 566 A.2d at 42 (noting that, while the plaintiff

"alleges that it suffered pecuniary loss in its place of business," in "cases of economic loss," the

"place of injury does not play as important a role for choice of law purposes as it does where

personal injury is alleged" (citing Restatement (Second) of Conflict of Laws § 145 cmt. f)).  And

it is not entirely clear where the injury here predominately occurred.  Particularly with respect to

Intelect's unjust enrichment and promissory estoppel claims, neither party identifies where along

the Metrorail line—which stretches from the District of Columbia into Maryland and Virginia—

Intelect performed its portion of the project and supplied labor and equipment that Defendants

allegedly accepted to their benefit.  In sum, the Court concludes that the place of the injury might

support application of Maryland law, but finds this factor of limited importance here.  Similarly,

because Intelect is a citizen of Maryland, Am. Compl. ¶ 3, and none of the Defendants are

alleged to be citizens of the District of Columbia, *id.* ¶¶ 4–9, the third factor, concerning the

place of incorporation or business of the parties, also seems to counsel in favor of Maryland law.

While neither party discusses the second Restatement factor, construing the reasonable

factual inferences from Intelect's complaint in its favor, *Washkoviak*, 900 A.2d at 183, the Court

finds that the place where the conduct causing the injury occurred was likely the District of

Columbia.  Intelect's claims are centered on actions Defendants took, or did not take, when

contracting with WMATA and Powerwave.  The Court presumes that those discussions and

communications likely took place in the District.  In the same vein, the fourth factor, the place where the relationship is centered, favors applying District of Columbia law.  As Intelect points out, "the location of the project at issue, Metrorail stations and tunnels, is primarily in the District."  Pl.'s Mem. Opp'n at 3.  Despite Defendants' statement that "a portion of the project was performed in Maryland," Defs.' Reply at 3, that fact does not counsel in favor of the application of Maryland law, at least where neither party has identified whether Intelect's particular work on the project took place in the District of Columbia or in Maryland.  And, ultimately, Intelect alleges that the cascade of events resulting in its injury was caused when "WMATA only required the Carrier Consortium to obtain a nominal payment bond, relying on the Carrier Consortium to require its contractor to bond the Project in the full amount of the contract," and when Defendants allegedly failed to follow through on that obligation.  Am. Compl. ¶¶ 13, 20.  That cascade began in, and thus the relationship between the parties here is likely centered in, the District of Columbia.

That two factors favor application of Maryland law and two favor District Columbia law might alone counsel in favor of applying District of Columbia law as a tie-breaker.  *Washkoviak*, 900 A.2d at 182; *accord In re APA Assessment Fee Litig.*, 766 F.3d at 51, 55.  In any event, the District of Columbia Court of Appeals has instructed that the "mere counting of contacts is not what is involved" when applying the Restatement factors.  *Washkoviak*, 900 A.2d at 181 (quoting *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1072 (3d Cir. 1996)).  Rather "[t]he weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale."  *Id*.  Because the thrust of Intelect's claims focus on actions Defendants allegedly took, or failed to take, when contracting with WMATA and Powerwave, and when generally managing the WMATA project, as a qualitative matter the second and fourth factors should be provided

greater weight here.  Accordingly, the Court finds that District of Columbia law applies to this action.

The Court does acknowledge that, given "the lack of evidence available in the record defining the connections between appellants' claims and either jurisdiction," it is somewhat "difficult to make any kind of qualitative judgment at all."  *Id.* at 182.  The District of Columbia Court of Appeals instructs that "any uncertainty" with respect to choice of law questions at the motion to dismiss stage should be resolved in favor of the plaintiff and, furthermore, that if the court "cannot determine from the pleadings which jurisdiction has a greater interest in the controversy" the court "must apply the law of the forum state"—in this case the District of Columbia.  *Id.*  With this guidance in mind, this Court holds that "within the present context of a 12(b)(6) motion to dismiss," and given the limited factual presentation so far provided by the parties, it is not clear that Maryland law should be applied rather than District of Columbia law. *Id.* at 183.  In so concluding, however, the Court "leave[s] open the possibility that, after both parties have been afforded the opportunity to conduct discovery and present evidence," it will ultimately be the case that Maryland, rather than the District of Columbia, has "a greater interest . . . in the resolution of this controversy."  *Id.*[11]

---

[11] The Court also leaves open the possibility that the significant relationship factors will counsel in favor of applying Maryland law to some of Intelect's claims and District of Columbia law to others—a possibility the parties wholly overlook.  A court is "not bound to decide all issues under the law of a single jurisdiction; choice of law involves examination of the various jurisdictional interests as applied to the various distinct issues to be adjudicated." *Coleman*, 667 A.2d at 817*; see also, e.g.*, *Hercules & Co.*, 566 A.2d at 41–43 (concluding that "different interests are implicated" by the plaintiff's claims, and finding that Virginia law should apply to plaintiff's negligence and applied warranty claims but that District of Columbia law should apply to plaintiff's fraud and negligent misrepresentation claims); *In re APA Assessment Fee Litig.*, 766 F.3d at 45–46, 51–53 (noting that the parties had not contested that D.C. law should apply to an unjust enrichment claim, but resolving the parties' dispute over choice of law for the unfair competition claims).

### 3.  Count I: Negligence

Intelect's first claim is for negligence.  To state a claim of negligence under District of Columbia law, "a plaintiff must allege '(1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach.'" *Friends Christian High Sch. v. Geneva Fin. Consultants*, 39 F. Supp. 3d 58, 63 (D.D.C. 2014) (quoting *District of Columbia v. Fowler*, 497 A.2d 456, 462 n.13 (D.C. 1985)).  Whether a duty of care exists is a question of law "to be determined by the court as a necessary precondition to the viability of a cause of action for negligence," and the court must "consider the relevant evidence and make a decision on the pleadings, on summary judgment, or, where necessary, after a hearing." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 811 (D.C. 2011).

Here, Intelect alleges that "[e]ach of the members of the Carrier Consortium, in their capacities as obligees on the Powerwave Payment Bond, had a duty of care to those persons who supplied labor and materials to the Project to assure them of full and complete coverage, not just partial coverage for Phase I," and that the Defendants "negligently breached their duty of due care to Intelect by their failure to assure full and complete coverage under the Payment Bond." Am. Compl. ¶¶ 32, 34.[12]  Intelect contends that as a "direct and proximate result" of that breach,

---

[12] Intelect also alleges that "[u]pon learning of Powerwave's financial instability, each of the other members of the Carrier Consortium had an affirmative duty of due care to notify Intelect that its continued supply of labor and materials to the Project was at Intelect's risk, in that the outstanding payment bond for which the Carrier Consortium members were obligees did not cover the work that they were performing on Phase II and III, which was then underway." Am. Compl. ¶ 33.  The Court does not understand this "duty," stylized as a duty to notify or disclose information, to meaningfully differ from the duty Intelect invokes in its separate claim for negligent misrepresentation, in which it alleges that "[t]he Carrier Consortium had a duty of care to those persons, including Intelect, who supplied labor and materials to the Project to advise them that the Project was only partially bonded, and that they were at risk of loss if they continued to work on the Project beyond Phase I." *Id.* ¶ 40.  Accordingly, the Court defers

it "suffered a loss in the amount of $1,013,016.83 that would have been covered by the Powerwave Payment Bond had the bond covered the entire Project, not just Phase I." *Id.* ¶ 35.

Defendants' motion focuses solely on the duty element, claiming that Intelect has failed to "identify and adequately plead a legal duty the Carriers owe to Intelect." Defs.' Mem. Supp. at 7. They cite the Second Restatement of Torts for the proposition that "[t]he fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Defs.' Mem. Supp. at 8 (quoting Restatement (Second) of Torts § 314 (Am. Law Inst. 1965)). They claim that "a contract between third parties . . . is insufficient to establish any duty the Carriers separately owe to Intelect." *Id.* at 9–10.

In response, Intelect contends that "having undertaken to obtain a bond, the Carriers had a duty to obtain an *effective* bond, not one that was the practical equivalent of no bond at all." Pl.'s Mem. Opp'n at 5 (emphasis in original). And Intelect's complaint seems to refer generally to a duty arising as a result of the Defendants' "capacities as obligees on the Powerwave Payment Bond." Am. Compl. ¶ 32. On the one hand, this allegation, and Intelect's arguments in its opposition, could be read broadly as a claim that *whenever* a party requires a payment surety bond from another, that party undertakes a duty to ensure a bond that covers the entirety of the project. Yet, Intelect cites no cases—in the District of Columbia or otherwise—accepting such a far-reaching argument. Intelect does invoke several out-of-jurisdiction cases in which courts have held that plaintiffs could bring a negligence claim against a *public entity* for its failure to assure full bond coverage of a public project. But in each of those cases the court found that the

---

discussion of that duty until its analysis of the negligent misrepresentation count, and confines its discussion of Count I to Intelect's alleged duty to assure full bond coverage.

public entity's duty arose from a specific state or federal statute that required the governmental entity to verify or ensure the validity of a payment bond that was secured.[13]  *See, e.g.*, *Kammer Asphalt Paving Co. v. E. China Township Schs.*, 504 N.W.2d 635, 637, 640 (Mich. 1993) (citing Mich. Comp. Laws § 129.201); *Med. Clinic Bd. of City of Birmingham-Crestwood v. Smelley*, 408 So.2d 1203, 1207 (Ala. 1981) (citing Ala. Code § 39-1-1).  Moreover, as Intelect acknowledges, the decisions are not uniform and depend on courts' assessment of the language of the particular statute at issue.  *See* Pl.'s Mem. Opp'n at 7 (citing *O & G Indus., Inc. v. Town of New Milford*, 640 A.2d 110, 307 (Conn. 1994) (holding that, under the relevant Connecticut statute, the municipality owed "no duty to the plaintiff to require the general contractor to post a payment bond")).[14]  These cases do not hint that a general duty to third-parties arises in any case in which a private party undertakes to obtain a bond.

On the other hand, however, when read with reference to the other allegations made in the complaint, Intelect does plausibly allege a source of Defendants' duty to obtain a payment

---

[13] In the only comparable District of Columbia case, the District of Columbia Court of appeals declined to consider "the substantive question whether a suit can be maintained against the District for negligence in failing to enforce the payment bond provision of the Little Miller Act," D.C.'s local statute requiring prime contractors on public work projects to obtain a payment bond, because the plaintiff had failed to comply with the statutory notice requirement for bringing a claim against the District of Columbia.  *District of Columbia v. Campbell*, 580 A.2d 1295, 1301 n. 6 (D.C. 1990).

[14] Intelect cites two additional cases, but the Court finds those cases wholly irrelevant to the question of whether Defendants had a duty to ensure that Powerwave obtained a payment bond in the full amount of the project.  While Intelect is correct that in *United States ex rel. Hajoca Corp. v. Associated Mechanical, Inc.*, the district court denied summary judgment and held that the plaintiff had a valid cause of action against a general contractor who had failed to obtain a proper bond under the federal Miller Act, the cause of action at issue there was an unjust enrichment claim, not a negligence claim.  *See* No. 2:09-cv-2087, 2011 WL 484291, *5–7 (D. Nev. Feb. 7, 2011).  Similarly, in the other case Intelect cites, the Eighth Circuit considered a claim, based on a Missouri statute, that city officials had failed to perform their ministerial duties—and were therefore not protected by official immunity—in failing to require a bond for a public works project.  *Union Pac. R.R. Co. v. St. Louis Marketplace, Ltd. P'ship*, 212 F.3d 386, 389–91 (8th Cir. 2000).  Again, there was no negligence claim at issue in that case.

surety bond that is specific to the circumstances of this case: the WMATA-Carrier Consortium

contract.  Intellect emphasizes the "public-private partnership" nature of the project, and alleges

that "WMATA only required the Carrier Consortium to obtain a nominal bond, relying on the

Carrier Consortium to require its contractor to bond the Project in the full amount of the

contract."  Am. Compl. ¶ 13.  Intelect claims that the "Carrier Consortium assumed the role of

Owner" and that "Plaintiff's cause of action is grounded on the failure of the Carrier Consortium

to provide full surety bond coverage, as required by the contract documents, to assure payment to

those persons supplying labor and material to the Project."  *Id.* ¶ 2.  Read with reference to these

allegations, it is possible to read Intelect's allegation that the Defendants "negligently breached

their duty of due care to Intelect by their failure to assure full and complete coverage under the

Payment Bond," *id.* ¶ 34, as encompassing a duty that arose as a result of the WMATA-Carrier

Consortium contract, *see* Pl.'s Mem. Opp'n at 5 ("[H]aving undertaken to obtain a bond, the

Carriers had a duty to obtain an *effective* bond, not one that was the practical equivalent of no

bond at all." (emphasis in original)).

     As Intelect points out, the Restatement explains that there are exceptions to the general

principle that an actor has no duty to affirmatively act to protect another.  *See* Pl.'s Mem. Opp'n

at 7; *see also* Restatement (Second) of Torts § 314 cmt. a ("[A]n actor may have committed

himself to the performance of an undertaking, gratuitously *or under contract*, and so may have

assumed a duty of reasonable care of the other, *or even a third person*." (emphasis added)).  The

District of Columbia Court of Appeals, too, has "acknowledged that a legal duty arises when a

party undertakes to 'render[] services to another which he should recognize as necessary for the

protection of a third person or his things . . .'"  *Presley v. Commercial Moving & Rigging Inc.*,

25 A.3d 873, 888–89 (D.C. 2011) (quoting *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095,

1097 (D.C. 1994)).  That court has "looked to § 324A" of the Second Restatement of Torts when "determining whether a party who performs services under a contract for one party assumes a duty to an unrelated third party."[15]  *Id.* at 889.

In *Presley*, for example, the court considered a plaintiff's tort claim arising out of injuries he sustained after falling twenty feet from a cooling tower assembly on a State Department construction project.  *See id.* at 880.  One of the defendants, CRSS Constructors, Inc., had contracted with the General Services Administration ("GSA") to serve as the contract compliance consultant for that construction project.  *Id.* at 878.  Among other things, CRSS's contract with the GSA required it "to anticipate problems and immediately act to preclude or mitigate any negative effects on the construction project(s)," and to "employ inspectors who were responsible for scheduling, coordinating, and performing the actual specialized field work . . . ."  *Id.* (internal quotation mark omitted).  That contract was essential to the court's

---

[15] Section 324A of the Second Restatement provides:

> One who undertakes gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts, § 324A.  In *Presley* the District of Columbia Court of Appeals directly quoted the Second Restatement, but that court had previously stated that "the Restatement has not been formally adopted by this Court."  *Haynesworth*, 645 A.2d at 1097.  But even if the D.C. Court of Appeals has not formally adopted section 324A, the Court explained in *Haynesworth* that "it is clear that the particular concept" contained in that section "is well known and has been readily applied, where appropriate."  *Id.* (citing *Long v. District of Columbia*, 820 F.2d 409, 419 (D.C. Cir. 1987)).  As the Court explains below, however, § 324A's reference to *physical harm* might ultimately pose a problem for Intelect under the economic loss rule.

understanding of CRSS's duty.  The court explained that, "[t]hough [the plaintiff's] claim is premised upon a tort theory," the relevant contract "nevertheless remains central to our analysis of duty, as it defines the scope of the undertaking and the services rendered by CRSS."  *Id.* at 889.  "[F]inding a common law duty depend[ed] primarily on whether CRSS should have recognized that its undertakings pursuant to the [] contract were necessary for the protection of Presley."  *Id.*  Thus, "[b]y examining the scope of CRSS'[s] undertaking and services pursuant to the [] contract, we can then determine whether CRSS assumed a duty to exercise reasonable care in carrying out its contractual obligations that extended to workers such as Presley on the site."  *Id.*

The District of Columbia Court of Appeals was ultimately unpersuaded in *Presley* that a duty arose "based upon the facts in [that] case," but the court did note that "imposition of a duty may be appropriate in other cases, with different contractual arrangements."  *Id.*  And that court has cited approvingly to cases in the D.C. Circuit finding a common law duty to third parties arising out of a contractual arrangement.  *See Haynesworth*, 645 A.2d at 1097 (citing *Long v. District of Columbia*, 820 F.2d 409, 419 (1987)).  In *Long v. District of Columbia*, for example, the D.C. Circuit concluded that the Potomac Electric Power Company had assumed a duty to third parties—namely, the traveling public—when it contracted to maintain the District's traffic signals.  820 F.2d at 417; *see also Caldwell v. Bechtel, Inc.*, 631 F.2d 989, 992, 997 (D.C. Cir. 1980) (considering a contract between the defendant, Bechtel, and WMATA that required Bechtel to provide "safety engineering services" and concluding that "by assuming a contractual duty to WMATA, Bechtel placed itself in the position of assuming a duty to appellant in tort").

Here, at the motion to dismiss stage, the relevant contract documents are not before the Court.  Intelect has alleged that WMATA relied upon Defendants to obtain a surety bond and

required only a nominal bond from Defendants. Am. Compl. ¶ 13. The scope of that obligation, and the terms of those parties' contract, "remains central" to the Court's analysis of whether Defendants owed any duty to Intelect in tort, as a subcontractor for whom the payment bond would ostensibly benefit. *See Presley*, 25 A.3d at 889. To be sure, there is some imprecision in Intelect's allegations which raises some question about whether Defendants truly took on a duty as a result of their contract with the WMATA. For example, Intelect refers only generally to the "contract documents" as requiring "the Carrier Consortium to provide full surety bond coverage . . . to assure payment to those persons supplying labor and material to the Project." Am. Compl. ¶ 2. In addition, Intelect merely states that WMATA was "*relying* on the Carrier Consortium to require its contractor to bond the Project in the full amount of the contract," and does not explicitly allege whether that condition was contained in the parties' contract. *Id.* ¶ 13 (emphasis added).

Nevertheless, given Intelect's factual allegations about the relationship between WMATA and Defendants—and the agreement among those parties about Defendants' obligation to obtain a payment surety bond in the full amount of the contract price—the Court concludes that Intelect has plausibly alleged a duty that could provide recovery in tort. The Court thereby will deny Defendants' motion to dismiss with respect to Count I, but declines to definitively determine at this time whether Defendants owe a duty to Intelect. *Accord Jefferson v. Collins*, 905 F. Supp. 2d 269 (D.D.C. 2012) (citing *Presley* and noting that the renovation contract relevant to the defendants' putative duties to the plaintiffs was "not yet before the Court for its review" given "the preliminary stage of this litigation," and explaining that "it would be premature for the Court to rule on whether the Renovator Defendants owed a legal duty to the plaintiffs on this ground"); *cf. Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49, 57

(D.D.C. 2012) ("Finding the question of duty similarly unresolved here, the Court will permit Plaintiff's claims to proceed at this stage of the litigation, pending further briefing by the parties after some discovery.").

The Court notes that a separate doctrine, the economic loss rule, may or may not pose a problem for Intelect. Defendants invoke the rule in passing and in a single sentence of their memorandum, but do not further develop the argument. *See* Defs.' Mem. Supp. at 8–9. "Generally, under the economic loss rule, a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those loses in tort." *Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014) (quoting *Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995)). The District of Columbia Court of Appeals recently adopted the economic loss doctrine, resolving what it described as "a matter of first impression." *See id.* at 980. That court held in *Aguilar* that "[t]he economic loss doctrine in the District of Columbia bars recovery of purely economic losses in negligence, subject to only one limited exception where a special relationship exists." *Id.* at 985–86. In that case, several cooks, servers, bartenders, and other employees of businesses that were flooded in the Washington Harbour retail complex argued that the defendants "owed them a duty of care to ensure the safe operation of Washington Harbour, that included raising the flood walls when notified of an impending flood." *Id.* at 980–81. The plaintiffs sought to recover lost wages resulting from the closure of their places of employment due to that flood. *Id.* at 980.

Yet, the contours of the economic loss rule are nuanced and it is not immediately clear to the Court that the economic loss rule would necessarily operate to Intelect's detriment on the facts of this case. *See* 3 Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 607 (2d ed. 2011) ("[T]he implication of references to 'the' economic loss rule that there is but a

single overarching economic loss rule is misleading. Several discrete rules dominate the decisions, not a single rule."). In *Aguilar*, the District of Columbia Court of Appeals appeared to be confronted with a situation in which plaintiffs claimed that their adverse economic consequences were foreseeable to the defendants and that that foreseeability *alone* sufficed to give rise to a duty of care. *See* 98 A.3d at 981 (describing plaintiffs' claim as urging "the court to ignore the economic loss doctrine in favor of a foreseeability test *to determine whether appellees owed them a duty of care* to raise the flood walls to prevent economic injury" (emphasis added)). In this case, by contrast, if the Court were to find that a duty of care to Intelect arose out of the WMATA-Carrier Consortium contract, there would be a *separate* basis for Defendants' duty. And the District of Columbia Court of Appeals has previously stated that, "[i]n cases involving negligent performance of a contract, liability to third parties who suffer only economic loss as a result depends on whether or not the defendant owed a duty of reasonable care to the plaintiff." *Aronoff v. Lenkin Co.*, 618 A.2d 669, 685 (D.C. 1992); *accord Jefferson*, 905 F. Supp. 2d at 291; 3 Dobbs, Hayden & Bublick, *supra*, § 610 ("Although the plaintiff can get no advantage from a breach of defendant's duty to a third person, *the defendant might owe a second, independent duty to the plaintiff*." (emphasis added)). Thus, if an intendent duty of care exists—beyond Intelect's position as an economic actor merely effected by Defendants' purported breach of contract—the economic loss rule does not appear to bar recovery.

As far as the Court can tell, the District of Columbia Court of Appeals has not refined or further developed its economic loss rule since *Aguilar* was decided. Another Court in this district, in a pre-*Aguilar* decision, seemed to view the doctrine as a limitation on tort recovery even where an independent duty of care is potentially cognizable. *See Himmelstein*, 908 F.

Supp. 2d at 58 (declining to decide at the motion to dismiss stage whether a "special relationship between a creditor and debtor" suffices to "create[] an independent duty that would support a negligence claim," and permitting the claims to proceed, but nevertheless noting that the court had "serious concerns" that the claims "may alternatively be barred by the economic-loss doctrine"). *But see Aguilar*, 98 A.3d at 984–86 (concluding that a "'special relationship' between the parties" can create "an independent duty of care" to overcome the economic loss rule). Moreover, each of the cases finding (or considering) a duty of care arising out of a contractual obligation involved claims for personal injury or circumstances presenting a risk of personal injury. *See, e.g.*, *Presley*, 25 A.3d at 877; *Long*, 820 F.2d at 410–11; *Jefferson*, 905 F. Supp. 2d at 291. In fact, the Restatement itself speaks only of liability "to the third person for *physical harm*," although the District of Columbia Court of Appeals' language might be read more broadly. Restatement (Second) of Torts, § 324A. Thus, there remains at least some question whether the economic loss doctrine might apply to bar Intelect's claims for purely economic losses in this case, and the parties should address the economic loss rule more fully in future briefing.

At this juncture, however, and pending further information about the parties' contractual relationships, the Court concludes that Intelect has stated a sufficiently plausible claim of negligence to allow discovery to proceed.[16]

---

[16] The Court further notes that the District of Columbia is a pure contributory negligence jurisdiction. *See Lyons v. Barrazotto*, 667 A.2d 314, 321 (D.C. 1995) ("A plaintiff's contributory negligence is a complete bar to recovery in this jurisdiction."); *see also Massengale v. Pitts*, 737 A.2d 1029, 1031–32 (D.C. 1999) (describing the District of Columbia as "a pure contributory negligence jurisdiction"). To establish contributory negligence, the party asserting the defense must "'establish, by a preponderance of the evidence, that the plaintiff failed to exercise reasonable care' and that this failure was a substantial factor in causing the alleged damage or injury." *Massengale*, 737 A.2d at 1031 (internal citation omitted) (quoting *Poyner v. Loftus*, 694 A.2d 69, 71 (D.C. 1997)). If Defendants can show that Intelect failed to exercise

### 4.   Counts II & VI: Negligent Misrepresentation & Constructive Fraud

Intelect also brings related claims of negligent misrepresentation and constructive fraud. Intelect's negligent misrepresentation claim alleges that by undertaking "the duty to assure meaningful and effective coverage by the surety," Defendants also undertook a "duty of due care . . . to advise [those persons who supplied labor and materials] that the Project was only partially bonded." Am. Compl. ¶¶ 37, 40.  "By its failure to advise Powerwave's subcontractors and suppliers that they were at risk in working on Phases II and III of the Project," Intelect contends that "the Carrier Consortium implicitly represented to such parties, including Intelect, that they would be paid by the Payment Bond surety if not paid by Powerwave." *Id.* ¶ 41.  Intelect further alleges that it "reasonably relied on the Payment Bond to obtain payment if not paid by Powerwave," and that it "would not have entered into its Subcontract Agreement with Powerwave had Intelect known that the Project was only partially bonded." *Id.* ¶ 39.

In support of its constructive fraud claim, Intelect similarly alleges that, because of the "payment procedures involved in the Project" and "the obligations contained in the Contract Documents that the Project be bonded, a special relationship of trust and confidence existed among the Carrier Consortium, Powerwave, and Intelect." *Id.* ¶ 75.  Thus, Intelect claims that "[t]he Carrier Consortium's failure to advise Intelect that Intelect was providing labor and materials to the benefit of the Carrier Consortium at its risk . . . . constituted constructive fraud." *Id.* ¶ 76.

To state a claim for negligent misrepresentation under District of Columbia law, the plaintiff must show: (1) that the defendant "made a false statement or omitted a fact that he had a

---

reasonable care by subcontracting with Powerwave without ascertaining whether a bond was in place, or without determining the value for which the project was bonded, contributory negligence might bar Intelect's recovery.

duty to disclose," (2) that the statement or omission "involved a material issue," and (3) that the plaintiff "reasonably relied upon the false statement or omission to his detriment."[17] *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1207 (D.C. 1999); *accord Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015). These elements are similar to those of a common law fraud claim, except that a negligent misrepresentation claim "do[es] not include the *scienter* requirements of a fraud claim." *Parr v. Ebrahimian*, 774 F. Supp. 2d 234, 240 (D.D.C. 2011); *see Sundberg*, 109 A.3d at 1131 ("In contrast to a complaint that alleges fraudulent misrepresentations, a complaint alleging negligent misrepresentations need not allege that the defendant had knowledge of the falsity of the representation or the intent to deceive."). In the same vein, a constructive fraud claim also "includes all the same elements as actual fraud except the intent to deceive."[18] *Cordoba Initiative Corp. v. Deak*, 900 F. Supp. 2d 42, 50 (D.D.C. 2012) (considering negligent misrepresentation and constructive fraud claims in tandem). In addition to those elements, a constructive fraud claim also "requires a plaintiff to demonstrate the existence of a confidential relationship between the plaintiff and defendant, 'by which the defendant is able to exercise extraordinary influence over plaintiff.'" *Id.* (quoting *McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 6 n.7 (D.D.C. 2009)).

Generally, "mere silence does not constitute fraud unless there is a duty to speak." *Sundberg*, 109 A.3d at 1131 (quoting *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438

---

[17] "The District of Columbia is one of the minority of jurisdictions that permits an innocent misrepresentation claim to proceed as either a cause of action to rescind the contract and restore the status quo *or* a cause of action for damages in tort." *Cadet v. Draper & Goldberg, PLLC*, No. 05-2105, 2007 WL 2893418, at *11 n.9 (D.D.C. Sept. 28, 2007) (citing *Barrer v. Women's Nat'l Bank*, 761 F.2d 752, 758 n.29 (D.C. Cir. 1985)). The cases cite the same elements for a negligent misrepresentation claim irrespective of context.

[18] Accordingly, where helpful to explain the "duty to disclose" required, the Court relies on cases discussing common law fraud or fraudulent misrepresentation.

(D.C. 2013) (internal quotation marks omitted)).  "[I]n the District of Columbia and other

jurisdictions, a duty to speak arises in the fraud context only when there is some special

relationship or contact between the parties justifying the imposition of a duty."  *Jefferson*, 905 F.

Supp. 2d at 287.  Such a duty to speak may "stem from a fiduciary relationship," or arise in "'an

instance where a material fact is *unobservable or undiscoverable* by an ordinarily prudent person

upon reasonable inspection.'"  *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 51

(D.D.C. 2011) (quoting *Cadet*, 2007 WL 2893418, at *6).  A duty may also arise "as a result of a

partial disclosure."  *Jefferson*, 905 F. Supp. 2d at 287.

      Here, because Intelect does not allege that Defendants made any affirmative statements,

Intelect must rely on a "duty to disclose" information to support its negligent misrepresentation

and constructive fraud claims.  Intelect does not claim that it has a fiduciary relationship with

Defendants.  Nor does Intelect allege a partial disclosure—or indeed any direct communication

at all—with Defendants prior to either Powerwave's default or Intelect's entry into its

subcontract with Powerwave on June 16, 2010 (the action it allegedly took after reasonably

relying on the payment bond).  *See Id.* at 287–88 (finding "no basis for imposing a duty to

speak" where "plaintiffs do not allege *any* contact with the . . . Defendants prior to closing on the

Property").  Finally, there is no indication that the amount of the payment bond obtained by

Powerwave was unobservable or undiscoverable, nor does Intelect claim as much.  Intelect in

fact alleges the opposite.  After Defendants allegedly "refused to provide" a copy of the bond,

Intelect contends that it "was able to obtain a copy of the bond indirectly, through its insurance

agent."  Am. Compl. ¶ 31.

      At bottom, Intelect merely alleges that, by undertaking "the duty to assure meaningful

and effective coverage by the surety," Defendants "*implicitly represented* to those persons who

supplied labor and materials to the Project, including Intelect, that they would be paid by the

surety if not paid by Powerwave," and had a "duty of due care . . . to advise them that the Project

was only partially bonded." *Id.* ¶¶ 37, 40 (emphasis added).  But unlike with respect to their

allegations that Defendants had to *secure* the bond, Intelect alleges no duty on Defendants' part

to affirmatively communicate to Powerwave's subcontractors whether Powerwave had secured,

or had failed to secure, the bond.  It may be that Intelect *assumed* such a bond had been secured,

and that Defendants negligently breached their duty under the WMATA-Carrier Consortium

contract to obtain that bond.  But it does not automatically follow that Defendants were under

any additional affirmative duty to inform all subcontractors with whom they had not contracted

about the status or amount of that bond.  *Accord Jefferson*, 905 F. Supp. 2d at 287, 290–92

(finding that there was no basis for imposing a duty to speak on defendants who renovated

plaintiffs' home under a contract with a third party, but considering separately, and declining to

determine at the motion to dismiss stage, whether those same defendants owed a legal duty of

care to the plaintiffs based on their contract with a third party).  Thus, Intelect has failed to state

a claim for negligent misrepresentation or constructive fraud.

    For much the same reasons, Intelect has not supported its allegation that "a special

relationship of trust and confidence existed among the Carrier Consoritum, Powerwave[,] and

Intelect"—an additional element necessary for its constructive fraud claim.  Am. Compl. ¶ 74;

*see Cordoba Initiative*, 900 F. Supp. 2d at 50.  "Establishing a confidential relationship is a

difficult burden."  *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 461 (D.D.C. 1997).  The

requisite relationship "requires more than parties' transacting at arms' length and is one 'in

which one party has gained the trust and confidence of the other, enabling the first party to

exercise extraordinary influence over the other.'"  *Himmelstein*, 908 F. Supp. 2d at 59 (quoting

*3D Global Solutions, Inc. v. MVM, Inc.*, 552 F. Supp. 2d 1, 8 (D.D.C. 2008)).  "'Mental capacity, age, education, business knowledge, and the extent to which the alleged victim entrusted her affairs to the other party are among the relevant factors in establishing the existence of such a relation.'"  *Id.* at 61 (quoting *Goldman v. Bequai*, 19 F.3d 666, 674 (D.C. Cir. 1994)).

Intelect has not alleged facts sufficient to plausibly suggest the existence of a confidential relationship in this case; indeed, Intelect has done no more than make a conclusory allegation that a "special relationship of trust and confidence existed" among the parties.  Am. Compl. ¶ 74.  And based on what can be gleaned from the other allegations in the complaint, no facts plausibly support the existence of a confidential relationship.  All parties are sophisticated business entities, and there is no indication that Intelect either entrusted its affairs to Defendants or was particularly susceptible to Defendants' influence.  The parties appear to have had, at most, only limited communication prior to Powerwave's default and bankruptcy  *Cf. Cordoba Initiative*, 900 F. Supp. 2d at 51 (finding a confidential relationship plausibly alleged where defendants had advised and supported plaintiff "over several years").  Thus, Intelect has not plausibly alleged the confidential relationship necessary to support its constructive fraud claim.[19]

The Court will dismiss Counts II and VI of Intelect's Amended Complaint.

---

[19] Courts in this district have also held that plaintiffs must plead fraud, constructive fraud, and negligent misrepresentation claims with particularity pursuant to Federal Rule of Civil Procedure 9(b).  *See, e.g.*, *Jefferson*, 905 F. Supp. 2d at 286; *3D Global Solutions, Inc.*, 552 F. Supp. 2d at 7–9; *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 254 (D.D.C. 2004).  While Defendants only contest the imposition of a duty, the Court notes that Intelect's complaint—which is devoid of any specificity regarding "the time, place and content of the false misrepresentations" or the specific occasions on which Defendants failed to disclose the information about the Powerwave bond—likely also falls well short of the particularity required by Rule 9(b).  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994).

#### 5.  Count III: Third-Party Beneficiary

Intelect also alleges that it is a third-party beneficiary of the contract documents.  "A third party may sue on a contract if the contracting parties intended the third party to benefit," even if the third party was not a party to that contract.  *District of Columbia v. Campbell*, 580 A.2d 1295, 1302 (D.C. 1990); *see also W. Union Tel. Co. v. Massman Const. Co.*, 402 A.2d 1275, 1277 (D.C. 1979) ("One who is not a party to a contract nonetheless may sue to enforce its provisions if the contracting parties intend the third party to benefit directly thereunder."). "'Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly' the party urged to be a third-party beneficiary."  *Oehme, van Sweden & Assoc., Inc. v. Maypaul Trading Servs. Ltd.*, 902 F. Supp. 2d 87, 100 (D.D.C. 2012) (quoting *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008)).  "'[A]n indirect interest in the performance of the undertakings' is insufficient" to confer third-party beneficiary status.  *Fort Lincoln*, 944 A.2d at 1064 (alteration in original) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)).  To determine whether a party is a third-party beneficiary, a court considers "the parties' intentions 'at the time the contract was executed.'"  *Oehme*, 902 F. Supp. 2d at 100 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 n.7 (3d Cir. 2001)).

Here, Intelect plausibly alleges that it that it was an intended beneficiary of the "Contract Documents requiring full bonding" and the "Powerwave Payment Bond," albeit by a somewhat attenuated series of incorporations within the contract documents.  Am. Compl. ¶¶ 50, 53.  As already explained, Intelect alleges that WMATA waived its normal bonding requirements in reliance upon the Carrier Consortium's promise to obtain a bond, in the full contract price, from

*its* general contractor. *Id.* ¶¶ 46–47. Accordingly, Intelect claims that the "purpose of the Payment Bond obtained by Powerwave . . . in addition to assuring payment to those persons who supplied labor and materials to the Project under contract with Powerwave, was to substitute the nominal bond which had been jointly obtained by each of the members of the Consortium with the Powerwave Bond." *Id.* ¶ 48.

In their opening memorandum, Defendants' only argument for dismissal is that "Intelect does not specify any provision of a contract . . . that identifies Intelect as an intended third-party beneficiary." Defs.' Mem. Supp. at 12. Yet, an intention to benefit a party directly need not be express; it can also be implied. *Fort Lincoln Civic Ass'n*, 944 A.2d at 1064. Moreover, while it may well be that Intelect, as a downstream subcontractor, is merely an incidental beneficiary of that contract, the court is unable to conclusively determine the issue at present. Neither the WMATA-Carrier Consortium contract nor the Powerwave-Carrier Consortium contract is currently before the Court on this motion. At this stage, the Court must take all factual allegations pled in the complaint as true, and Intelect has pled that, under the contract documents "as a whole" the "Carrier Group had an obligation to WMATA, in exchange for a waiver of the normal requirement of full bonding by the Carrier Group, to assure that Powerwave obtained bonding in the full amount" of the contract, and that "Intelect was within the class of persons who were intended beneficiaries of the Powerwave Payment Bond." Am. Compl. ¶¶ 51, 50. If any of those allegations plainly conflict with the contractual terms, Defendants could have attached the relevant contracts to their motion. "[A]t the motion to dismiss stage, [the court] may consider 'documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.'"

*Angelex Ltd. v. United States*, -- F. Supp. 3d ----, 2015 WL 5011421, at *11 n.11 (D.D.C. Aug. 24, 2015) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)); *see also Banneker Ventures, LLC v. Graham*, 789 F.3d 1119, 1133 (D.C. Cir. 2015) ("The prototypical incorporation by reference occurs where a complaint claims breach of contract, and either party attaches to its pleading an authentic copy of the contract itself."). Alternatively, Defendants could have presented the contracts as "matters outside the pleadings" and converted the motion, on this count, to one for summary judgment. *See* Fed. R. Civ. P. 12(d); *see also Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011). Defendants have done neither. In the absence of those documents, and taking the allegations in Intelect's complaint as true, Intelect is correct that whether or not it is, in fact, an intended—expressly or impliedly—third party beneficiary "must be determined after discovery as to the terms of the WMATA-Carriers contract documents." Pl.'s Mem. Opp'n at 16. At this juncture, therefore, Intelect has adequately plead a breach of contract from which it can recover as an intended third-party beneficiary.

Defendants raise an additional argument for the first time in their reply. But "it is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139–40 n.4 (D.D.C. 2011) (quoting *Aleutian Pribilof Islands Ass'n v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008)). In any event, the argument is unsuccessful. Defendants point out that they are obligees under the Powerwave Bond, and that they owe no duty under the bond. They therefore invoke the legal principle that a third-party beneficiary claim cannot be brought against the promisee of a contract, and may only be brought against the promisor. Defendants' argument validly states the law, but it does not benefit them. The District of Columbia Court of Appeals has held that,

"[i]n the vast majority of cases, the third-party beneficiary's action lies only against the promisor." *See Campbell*, 580 A.2d at 1303.  Thus, to the extent Intelect seeks to recover as a beneficiary of the Powerwave-Carrier Consortium contract, Intelect is likely barred from doing so.  Nevertheless, Defendants were *promisors* under the WMATA-Carrier Consortium contract which, Intelect alleges, required the Defendants to obtain a payment bond for the full contract price.  Indeed, perhaps anticipating this argument, Intelect's complaint specifically acknowledges that, the Carrier Consortium "was a promisee, not a promisor, with respect to the specific contract clause in the Carrier Group-Powerwave Construction Contract which required bonding," but claims that "under the Contract Documents as a whole, the Carrier Group *had an obligation to WMATA*, in exchange for a waiver of the normal requirement of full bonding . . . , to assure that Powerwave obtained bonding in the full amount of the Carrier Group-Powerwave Construction Contract."  Am. Compl. ¶ 51 (emphasis added).  And if the Carrier Consortium is the promisor on the WMATA-Carrier Consortium contract, a third-party beneficiary claim may be asserted against them on the basis of that contract.

Accordingly, the Court will deny Defendants' motion with respect to the Count III.

### 6.  Counts IV & V: Implied Contract & Unjust Enrichment

Intelect also asserts claims of implied contract (Count IV) and unjust enrichment (Count V).  "The District of Columbia recognizes causes of action for unjust enrichment and quantum meruit as implied contract claims in which there is no express contract between the parties but contractual obligations are implied, either in fact (quantum meruit) or in law (unjust enrichment)."  *Plesha v. Ferguson*, 725 F. Supp. 2d 106, 111 (D.D.C. 2010).  The causes of action are alternative remedies, however, and "in order to claim a remedy for unjust enrichment, there must be no contract, either express or implied."  *Schiff v. Am. Ass'n of Retired Pers.*, 697

A.2d 1193, 1194 n.2 (D.C. 1997); *see also Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir.

1973) ("There is, of course, no need to resort to [unjust enrichment] when the evidence sustains

the existence of a true contract, either express or implied in fact."). Thus, the Court considers the

two theories together.

   While "the District of Columbia Court of Appeals uses the term 'quantum meruit' to

describe both forms of recovery, it distinguishes between these two causes of action." *U.S. ex rel*

*Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 246 (D.C. Cir. 1996) (internal citation

omitted).[20] An "implied-in-fact contract is a true contract, containing all necessary elements of a

binding agreement; it differs from other contracts only in that it has not been committed to

writing or stated orally in express terms, but rather is inferred from the conduct of the parties in

the milieu in which they dealt." *Bloomgarden*, 479 F.2d at 208. To state a claim for an implied-

in-fact contract, a plaintiff must demonstrate that the parties' conduct implied the existence of a

contractual relationship by establishing: "(1) valuable services rendered by the plaintiff; (2) for

the person from whom recovery is sought; (3) which services were accepted and enjoyed by that

person; and (4) under circumstances which reasonably notified the person that the plaintiff, in

performing such services, expected to be paid." *Providence Hosp. v. Dorsey*, 634 A.2d 1216,

1218–19 n.8 (D.C. 1993). To assert a claim for unjust enrichment, by contrast, the plaintiff

need only show that "'(1) the plaintiff conferred a benefit on the defendant; (2) the defendant

retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is

unjust.'" *Id.* at 112 (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222

---

[20] Courts in this district have not been consistent in their use of terminology. The term "quantum meruit" has also been used narrowly to describe only an "implied-in-fact contract," while the term "quasi-contract" has been used to refer to an unjust enrichment claim. *See Plesha*, 725 F. Supp. 2d at 111 & n.3. For clarity, the Court will use the terms "implied-in-fact contract" and "unjust enrichment" to describe Intelect's claims here.

(D.C. 2005)); *see also Bloomgarden*, 479 F.2d at 210 ("For the purpose of preventing unjust enrichment, however, a quasi-contract—an obligation to pay money to another—will be recognized in appropriate circumstances, even though no intention of the parties to bind themselves contractually can be discerned.").

   In urging the Court to dismiss these counts, Defendants' sole argument is that an express contract already covers this subject matter.  Defs.' Mem. Supp. at 13.  It is true that, under District of Columbia law, "[n]either form of restitution is available when there is an actual contract between the parties."  *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 104 (D.D.C. 2006); *see also Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 64 (D.C. 2005) ("One who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement."). Applied to the circumstances of this case, however, Defendants' argument misses the mark.  The principle that a contract between the parties will bar an implied-in-fact contract or unjust enrichment claim applies only where those claims are brought *among the contracting parties*. *See Jordan Keys*, 870 A.2d at 64.  Where, by contrast, a plaintiff brings implied-in-fact contract and unjust enrichment claims against a party with whom he has *not* contracted, the existence of separate contracts between the plaintiff and a third party or the defendants and a third party generally will pose no obstacle.  As the District of Columbia Court of Appeals has stated, despite the general rule, "[t]he equities may be quite different . . . where A, who claims that B has been unjustly enriched at A's expense, has a contract with C rather than with B."  *Id.*  In those circumstances, "[i]t is not at all clear" that "the existence of a contract with C should automatically bar A's claim of unjust enrichment against B."  *Id.*  In making that statement, the Court cited approvingly to a Florida case which held that a subcontractor could recover under an

unjust enrichment theory against an owner of a project.  *See id.* at 64–65 (citing *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So.2d 383, 387–88 (Fla. Dist. Ct. App. 1997)).  Other courts outside of this jurisdiction have similarly held, in comparable circumstances, that a party may recover in unjust enrichment against the owner of a project with whom they did not directly contract.  *See, e.g.*, *United States ex rel. Hajoca Corp.*, 2011 WL 484291, *5–6.

Moreover, as Intelect notes, the Third Restatement of Restitution definitively anticipates such situations.  *See* Pl.'s Mem. Opp'n at 13.  Comment a to § 25 explains that:

> Most transactions for which restitution may be available by the rule of this section fall within one of two common (though nonexclusive) patterns. In a first set of cases, A is a subcontractor, B is a property owner, and C (now unavailable) is the general contractor with whom both parties have dealt. . . . In either setting, the exit or insolvency of C leaves A without compensation for work that was performed as requested. If a further consequence of the interrupted transaction is that B stands to obtain a valuable benefit without paying for it, the outcome may be one that the law will characterize as unjust enrichment.

Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. a (Am. Law Inst. 2010). And the District of Columbia Court of Appeals has previously invoked § 25 of the Restatement when considering unjust enrichment claims.[21]  *See Jordan Keys*, 870 A.2d at 64–65 n.4; *News World Commun'cs*, 878 A.2d at 1222 n.5.

---

[21] In these cases the District of Columbia Court of Appeals cited to § 29 of the Third Restatement's Tentative Draft number 3.  Section 29 was renumbered as § 25 in the final version of the Restatement and, as set forth in the cases, the language is substantively similar.  *Compare* Restatement (Third) of Restitution and Unjust Enrichment § 25 (Am. Law Inst. 2010), *with Jordan Keys*, 870 A.2d at 65 n.4 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 29 (Am. Law Inst., Tentative Draft No. 3, 2004)).  The Restatement itself cites to both of these District of Columbia Court of Appeals cases, noting that the D.C. Court of Appeals was "citing § 29, which is now § 25 of the Official Text."  Restatement (Third) of Restitution § 25 (Supp. 2014).

Here, while contracts existed between the Defendants and WMATA, the Defendants and

Powerwave, and Powerwave and Intelect, there was no contract between the relevant parties: the

Defendants and Intelect.  Thus, the existence of other contracts will not bar Intelect's implied-in-

fact contract and unjust enrichment claims, and the Court will allow those claims to proceed.[22]

### 7.  Count VII: Promissory Estoppel

Intelect's final count asserts a promissory estoppel claim.  To state a claim for promissory

estoppel, a plaintiff "must show (1) a promise; (2) that the promise reasonably induced reliance

on it; and (3) that the promisee relied on the promise to his or her detriment."  *Myers v. Alutiiq*

*Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 272 (D.D.C. 2011) (citing *Simard v. Resolution Trust*

*Corp.*, 639 A.2d 540, 552 (D.C. 1994); *see also Bender v. Design Store Corp.*, 404 A.2d 194,

196 (D.C. 1979).  A promise "must be definite, as reliance on an indefinite promise is not

reasonable," and it must have "definite terms on which the promisor would expect the promisee

to rely," although the promise "need not be as specific and definite as a contract."  *In re U.S.*

*Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 97 (D.D.C. 2003).

Taken as true, Intelect's complaint plausibly alleges a definite promise that it reasonably

relied upon.  Intelect alleges that upon Powerwave's default and bankruptcy, "all progress on the

Project was suspended."  Am. Compl. ¶ 79.  Intelect further alleges that, "[i]n order to facilitate

---

[22] While the Court is skeptical that Intelect will be able to show that the limited conduct
between Intelect and Defendants evidenced a contractual relationship sufficient to succeed on an
implied-in-fact contract theory, Defendants have not challenged Intelect's complaint on this
ground.  Regardless, an unjust enrichment claim provides an alternative theory for recovery
"even though no intention of the parties to bind themselves contractually can be discerned."
*Bloomgarden*, 479 F.2d at 210.  Here, Intelect has alleged that the Carrier Consortium received
the benefits of Intelect's "labor, materials and knowhow," that the Carrier Consortium "failed to
make full payment to Powerwave" for those benefits, and that it "would be unjust for the Carrier
Consortium to accept the benefits provided to it by Intelect without paying therefor."  Am.
Compl. ¶¶ 69–71.

the prompt resumption of work under a replacement contractor, the Carrier Consortium represented to Intelect that work on the Project would resume in early Spring of 2013, and requested that Intelect leave its equipment and materials on site, and continue to maintain its labor force in place." *Id.* ¶ 79.  With a necessary inference, this promise is sufficiently definite to state a claim at this stage, despite Defendants' argument to the contrary.[23]  *See* Defs.' Mem. Supp. at 14.  "[A] promise is 'an expression of intention that the promisor will conduct himself in a specified way *or bring about a specified result in the future . . . .*"  *Choate v. TRW, Inc.*, 14 F.3d 74, 77–78 (D.C. Cir. 1994) (emphasis added) (quoting 1 Corbin on Contracts § 13 (1963)).  And that intention "need not contain language as specific and definite as that of an enforceable contract."  *Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d 139, 147 (D.D.C. 2007).  Defendants' purported representation constitutes a promise that work would resume under a replacement contractor—and that Intelect's work for the project would continue sometime "in early Spring 2013."  In the Court's view, Defendants' emphasis on the complaint's use of the term "represented" rather than "promised," Defs.' Reply at 11, is a distinction without a difference.  In either case, Defendants expressed an intention to bring about a particular result—the resumption of work, and presumably Intelect's continued work on the project—in the future.  *Cf. Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 145 (D.D.C. 2008) (concluding that the plaintiff had plead a sufficiently definite promise where defendant had allegedly promised plaintiff that, if he took no

---

[23] Specifically, while the Amended Complaint is not clairvoyant on this point, the Court infers that the Carrier Consortium promised Intelect that, if it maintained its labor force in place, it would continue as a sub-contractor on the project under the replacement general contractor.  Should Intelect seek leave to amend its complaint to provide factual allegations supporting the detrimental reliance element of its promissory estoppel claim—as explained below—it should also make this connection explicit.

action, his frequent flyer mileage would automatically be converted to a new airline "on or about

November 1, 2001").

At present, however, Intelect's complaint fails to allege how its reliance on that promise

worked to its detriment. *See Osseiran v. Int'l Finance Corp.*, 498 F. Supp. 2d 139, 147 (D.D.C.

2007) ("To factually allege promissory estoppel, a plaintiff must establish . . . that the promisee

relied on the promise to his detriment."). Intelect's complaint states that it "continued to incur

the expense of continuing to employ its key employees, at a cost of $400,000." Am. Compl. ¶

81. But Intelect's complaint oddly *does not* explain whether the promised resumption of work

took place. In fact, neither party explains what, if anything, happened with respect to the project

after Powerwave defaulted. If work did resume as promised, that fact might indicate (depending

on the circumstances) that the Defendants' promise did not work to Intelect's detriment. By

contrast, if Intelect failed to receive that work, or did receive the work but incurred greater

expenses than it would have absent Defendants' representation, those factual circumstances

might support a detrimental reliance allegation. Intelect does state in its opposition that its

"consent to [Defendants'] request caused [Intelect] to incur expenses which would have been

covered by the Carriers as a change order *if the Project had resumed as anticipated*." Pls.' Mem.

Opp'n at 16 (emphasis added). This statement implies—although it still does not state

outright—that the Project either did not resume, or did not resume with Intelect onboard. In any

event, this belated statement cannot sustain Intelect's claim, as "[i]t is axiomatic that a complaint

may not be amended by the briefs in opposition to a motion to dismiss." *Arbitraje Casa de

Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003).

Accordingly, the Court will dismiss Intelect's promissory estoppel claim based on the

complaint in its current form. The Court will permit Intelect to seek leave to amend its

complaint within 14 days from the issuance of this memorandum opinion, however, to clarify the promise it alleges and to properly plead factual allegations supporting the detrimental reliance element of its promissory estoppel claim.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Transfer Venue (ECF No. 5) is **DENIED** and Defendants' Motion to Dismiss (ECF No. 11) is **GRANTED IN PART AND DEINED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 5, 2016                          RUDOLPH CONTRERAS
                                                  United States District Judge